AGILE SOFTWARE CORPORATION, individually and on behalf of all others similarly situated, Plaintiffs,

v.

MERRILL LYNCH & COMPANY, INC.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; The American Stock Exchange, LLC; and The Bank of New York, Defendants.

No. C 01–01406 WHA.

United States District Court, N.D. California.

Nov. 15, 2001.

Bruce L. Simon, Marie Seth Weiner, Cotchett Pitre & Simon, Burlingame.

Kristin Linsley Myles, Avital T. Zer–Ilan, Munger Tolles & Olson LLP, San Francisco.

Marc T.G. Dworsky, Munger Tolles & Olson LLP, Los Angeles.

Mark A. Perry, Gibson, Dunn & Crutcher, San Francisco, Douglas R. Cox, Dunn & Crutcher LLP, Washington, DC.

Gregory Aker, Mark A. Stump, Wulfsberg Reese & Sykes, Oakland.

Mark Pennington, Office of General Counsel, Securities & Exchange Commision, Washington, DC.

## ORDER DISMISSING CASE

ALSUP, District Judge.

### INTRODUCTION

This action presents an issue of first impression, namely who bears the costs of providing shareholder materials for securities held in a so-called HOLDRS trust. This order holds that the issuer bears those costs under properly-promulgated regulations of the Securities and Exchange Commission. This order **DISMISSES** plaintiffs' complaint as to the federal claim and declines to exercise supplemental jurisdiction over the state-law claims.

### STATEMENT

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., began offering a product called HOLDRS (holding company depository receipts) in 1999. Merrill Lynch created HOLDRS by selecting several companies within an industry or a sector, buying their stock, and then placing the stock in a trust held by defendant Bank of New York. HOLDRS were receipts to the trust, representing each purchaser's interest in the underlying shares. Investors

could trade HOLDRS as securities on defendant American Stock Exchange ("AMEX").

Approval from the SEC was necessary before HOLDRS could be sold. On May 28, 1999, AMEX filed a rule change with the SEC, seeking permission to amend AMEX Rules 1200 through 1202 to allow trading HOLDRS. 64 Fed.Reg. 52559 (Sept. 29, 1999). On July 9, 1999, the proposed rule change was published for notice and comment.

The SEC approved AMEX's proposed rule change on September 29, 1999. The SEC's order stated that HOLDRS were beneficial to investors because HOLDRS enabled investors to "trade, at a price disseminated on a continuous basis, a single security representing a portfolio that the investor owns beneficially; engage in hedging strategies similar to those used by institutional investors … and retain beneficial ownership of the securities underlying the trust receipts." *Id.* at 52563. The SEC further explained that HOLDRS investors "will have the same rights, privileges and obligations as they would have if they beneficially owned the deposited securities outside of the trust issued receipt program" and that they "will receive reports, proxies and other information distributed by the issuers of the deposited securities to their security holders." *Id.* at 52559, 52560.

After the rule change, Merrill Lynch began offering HOLDRS in various industries, beginning with the Internet industry. HOLDRS in any given industry were generally comprised of stock in around twenty publicly-traded companies selected by Merrill Lynch. The prospectus provided by Merrill Lynch stated that HOLDRS would be issued pursuant to a trust agreement and that HOLDRS investors would be "beneficial owners" of the underlying stock (Prospectus at 15, 18). Generally, a beneficial owner is a person who does not have legal title to a security, but who has an underlying interest. The prospectus further stated that as beneficial owners, if investors became dissatisfied with any of the individual companies within a HOLDRS portfolio, the investors could unbundle the portfolio by selling the stock in the one company and retaining the stock in the others (*id.* at 18–19). The prospectus also stated that under the trust agreement, HOLDRS investors would have the right "to instruct the trustee to vote common stock, and to receive dividends and other distributions on the underlying securities" (*id.* at 15).

Plaintiff Agile Software Corporation was one of the publicly-traded companies included within Merrill Lynch's B2B (business to business) Internet HOLDRS. According to Agile, a B2B Internet HOLDRS receipt included ownership of four shares of Agile stock. When Agile prepared to send its annual proxy statements in the summer of 2000, Merrill Lynch and BNY informed Agile that Agile was required, pursuant to SEC rules, to provide statements for each owner of B2B Internet HOLDRS. According to Agile, this imposed large and unforseen costs on it because, in the normal operation of the market, investors do not buy stocks in lots of four. Agile contends that while the sales of HOLDRS benefitted Merrill Lynch, providing proxy statements, annual reports and other shareholder materials for all these nominal investors imposed an unfair financial burden on Agile.

Agile then brought this action on behalf of itself and other companies included within HOLDRS portfolios against Merrill Lynch and its parent, BNY, and AMEX.[1] Its complaint seeks a declaration as to who is obligated to provide shareholder materi-

---

1. No class has been certified. Nor has a motion to certify ever been made.

als for each HOLDRS investor (Compl.¶ 63). Specifically, it asks for an interpretation of 17 C.F.R. 240.14c–7, the SEC regulation governing distribution of certain shareholder materials, and asks the Court to impose an equitable exception to the rule, if none otherwise exists. It also brought state-law claims for (i) unjust enrichment, (ii) unfair business practice in violation of California Business and Professions Code Section 17200, and (iii) negligence.

Although the complaint seeks an interpretation of SEC regulations, Agile did not join the SEC as a defendant. Nor did it seek the SEC's guidance on whether it was required to provide shareholder materials for HOLDRS investors or petition the SEC to alter its rules before filing suit. After defendants moved to dismiss this action, the SEC was invited by the Court to submit an amicus brief. Both sides were allowed to discuss the issue with the SEC before the SEC submitted its brief. The SEC submitted a 22–page brief on October 16, 2001, explaining that Agile is required to provide shareholder materials for each HOLDRS investor. Agile then submitted a reply brief to the SEC's submission, and the other parties submitted short briefs concurring with the SEC's determination.

During the parties' communications with the SEC, issues beyond those raised in the motion to dismiss were addressed (SEC Br. 8). This order considers all the issues briefed as well as the new ones Agile presented to the SEC and included in its reply brief to the SEC's submission.

## ANALYSIS

■ The complaint seeks an interpretation of SEC regulations. It does not purport to challenge them (Opp. to Merrill Lynch at 12). Courts routinely interpret SEC regulations in private actions. *E.g., Howard v. Everex Systems, Inc.,* 228 F.3d

1057 (9th Cir.2000). Accordingly, Agile is not required to exhaust its administrative remedies with the SEC.

■ The Court agrees with the SEC that the unambiguous regulatory regime compels Agile to provide shareholder documents for each owner of B2B Internet HOLDRS. The Securities Exchange Act requires issuers of publicly-traded securities to transmit shareholder materials to "holders of record" in accordance with the rules prescribed by the SEC. 15 U.S.C. 78n(c). SEC Rule 14a–13 is entitled, "Obligations of Registrants in Communicating with Beneficial Owners." 17 C.F.R. 240.14a–13. It requires that if an issuer of securities ("registrant") knows that a fiduciary, such as a bank, is the holder of record for a security, the registrant must ask the holder of record whether there are any beneficial owners and how many proxy materials and annual reports are necessary for the beneficial owners. The registrant is then required to:

> Supply, in a timely manner, each record holder and respondent bank ... with copies of the proxy, other proxy soliciting material, and/or the annual report to security holders, in such quantities, assembled in such form and at such place(s), as the record holder or respondent bank may reasonably request in order to send such material to each beneficial owner of securities who is to be furnished with such material by the record holder or respondent bank.

17 C.F.R. 240.14a–13(a)(4). SEC Rule 14c–7 is entitled "Providing Copies of Material for Certain Beneficial Owners." 17 C.F.R. 240.14c–7. It contains an identical provision regarding other shareholder materials. 17 C.F.R. 240.14c–7(a)(4).

There is no dispute that Agile is a registrant or that BNY is the holder of record for HOLDRS. Agile, however, asks the Court to carve an "equitable" exception

into the SEC's rule. Alternatively, it argues that the HOLDRS investors are not "beneficial owners." As will be discussed, a judicially-created exception is inappropriate, and interpretations of the regulations urged by Agile are plainly contrary to the regulatory regime. Agile additionally argues that either BNY or Merrill Lynch assumed a contractual duty to provide shareholder documents to the HOLDRS investors. That argument is not addressed, as breach of any such duty appears to be a matter of state law and is irrelevant to the construction of the applicable federal regulations.

### 1. Equitable Exception.

■ The judicial arena is not the proper place to seek revision of SEC rules. Whether Agile is required to disseminate stockholder documents is a policy decision best made by the agency Congress entrusted with the task. Agile was and is free to petition the SEC to amend its regulations or to grant Agile an exception. 15 U.S.C. 78s(b), 78l(h). These decisions would be subject to judicial review on a complete record. 15 U.S.C. 78y. No "equitable" exception or irregular construction of SEC rules is warranted here, since Agile never petitioned the SEC before filing this action.[2]

### 2. Owners of HOLDRS Are Beneficial Owners.

■ Under SEC Rule 14b–2(a)(2), a "beneficial owner" includes "any person who has shares, pursuant to an instrument, agreement, or otherwise, the power to vote, or to direct the voting of a security." 17 C.F.R. 240.14b–2(a)(2). The prospectus for B2B Internet HOLDRS states that under the trust agreement, owners have the right "to instruct the trustee to

vote common stock, and to receive dividends and other distributions on the underlying securities" (Prospectus at 15). Thus, under the clear language of Rule 14b–2, the HOLDRS investors are beneficial owners because they have the right to vote. The power to intelligently vote, moreover, includes the right to be provided with shareholder documents which, as already stated, must come from the registrant. It is also worth noting that the view that the HOLDRS investors are beneficial owners was repeatedly stated by the SEC in its order approving the amendment to the AMEX rules and reiterated in its amicus brief. In approving the AMEX rule, for instance, the SEC stated: "Holders of trust issued receipts maintain beneficial ownership of each of the deposited securities evidenced by trust issued receipts." 64 Fed.Reg. 52560 (Sept. 29, 1999).

Agile argues that the applicable definition of "beneficial owner" should come from Rule 16a–1, instead of from Rule 14b–2 (Reply to SEC at 2). Under Rule 16a–1(a)(2)(i)(5)(iii), "beneficial owner" is defined to exclude "[i]nterests in securities comprising part of a broad-based publicly traded market basket or index of stocks, approved for trading by the appropriate federal authority." 17 C.F.R. 240.16a–1(a)(2)(i)(5)(iii). This argument, however, ignores the first sentence of Rule 16a–1, which states: "Terms defined in this rule shall apply solely to section 16 of the Act and rules thereunder." 17 C.F.R. 240.16a–1. By definition, therefore, Rule 16a–1 does not apply to the duty to transmit shareholder materials under Rule 14(c), 15 U.S.C. 78n(c), and the rules thereunder.

Agile argues that defendants recognize that the appropriate definition should come

---

**2.** In its brief, the SEC stated that it would consider changing its rules or granting Agile an exemption, but did not believe that it was appropriate to "consider rule changes or the granting of exemptions in the context of filing an amicus brief" (Br. 22 n. 13).

from Rule 16. It notes that Merrill Lynch's prospectus for B2B Internet HOLDRS stated: "B2B Internet HOLDRS are not intended to change your beneficial ownership in the underlying securities under federal securities laws, including Sections 13(d) and 16(a) of the Securities Act" (Reply to SEC at 2, n. 1). This statement by Merrill Lynch does not change the SEC regulations, however. Nor does it even indicate that Merrill Lynch understood Sections 13 and 16 to provide the exclusive definition of "beneficial owner."

■ According to Agile, HOLDRS violate AMEX rules and, therefore, HOLDRS investors should not be considered to be beneficial owners. Defendants contend that HOLDRS are a form of "trust issued receipts." AMEX Rule 1200 defines "trust issued receipts," as "a security (a) that is issued by a trust ('Trust') which holds specified securities deposited with the Trust; (b) that, when aggregated in some specified minimum number, may be surrendered to the Trust by the beneficial owner to receive the securities; and (c) that pays the beneficial owners dividends and other distributions on the deposited securities, if any are declared and paid to the trustees by an issuer of deposited securities." According to Agile, there is a question of fact as to whether HOLDRS meet this definition because there is no evidence in the record that the owners of B2B Internet HOLDRS are paid dividends. Part (c) of Rule 1200, however, simply refers to the payment of dividends "if any are declared." Being paid dividends is not a precondition for trading under Rule 1200. At all events, any failure to comply with AMEX rules would not change whether HOLDRS investors were beneficial owners under the securities regulations.

Agile also argues that the SEC's view that "beneficial owner" is defined in terms of voting rights is contrary to the definition of "trust issued receipt" in AMEX Rule 1200. According to Agile, in Rule 1200 "the alleged existence of beneficial ownership is tied to the receipt of cash dividends and stock distributions by the Portfolio Companies—not voting rights" (Reply to SEC at 1). Rule 1200 does not purport to define "beneficial owner," however, whereas SEC Rule 14b–2(a)(2) explicitly does. There is no reason for fabricating a definition based on Rule 1200 when one was already given by the SEC.

As can be seen from the plain language of the regulatory regime, Agile is obligated to disseminate shareholder information. There is no need for discovery. There is no remaining federal controversy between Agile and any of the defendants. The other defenses raised by the individual defendants, such as the immunity defense raised by AMEX, need not be addressed.

### 3. State–Law Claims.

■ Defendants contend that the remaining state law theories—breach of contract, unjust enrichment, and unfair business practice—are pre-empted as a matter of federal law. They ask that the Court exercise supplemental jurisdiction and proceed to dismiss the state-law claims with prejudice. In a recent decision, the Ninth Circuit held that an action brought against the NASD under state law was pre-empted because the "viability of any cause of action" was "based upon violation of exchange rules," and exclusive jurisdiction over such claims was vested in the federal courts under 15 U.S.C. 78aa. *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1211–12 (9th Cir.1998). *Sparta*, however, does not demand dismissal with prejudice of plaintiff's state-law theories.

This action is at the pleading stage. The state-law claims must be construed broadly, and beyond that are subject to

amendment. Unlike *Sparta*, here, it cannot be said that the viability of all of the state law theories are necessarily predicated on violations of SEC regulations. Moreover, plaintiff's contractual claim appears to be solely a matter of state law. As the SEC noted: "It is a question of contract law, which we do not address, whether Merrill's statements created a duty on the part of itself or the Bank, enforceable by Agile, to pay for the dissemination of shareholder communications" (SEC Br. 13). The Court cannot say at the pleading stage that any and all state-law claims would fail under the doctrine of pre-emption.

The state-law claims may be pursued in state court with complete rights of defendants to raise the defense of pre-emption in state court. This Court doubts that there would be any basis for removal to federal court for purely state-law claims, but that issue need not be addressed now. Since no federal component is left in this action, the Court declines to exercise supplemental jurisdiction over the state-law causes of action. 28 U.S.C. 1367(c)(3). These causes of action are therefore **DISMISSED**.

## CONCLUSION

For the foregoing reasons, this case is **DISMISSED**. The Clerk shall close the file.

**IT IS SO ORDERED.**